Filed 9/7/23  P. v. Rivas CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANDREW RIVAS,<br><br>Defendant and Appellant. | C094563<br><br>(Super. Ct. No. STKCRFDV20180013813) |

Defendant Andrew Rivas appeals from his convictions stemming from a domestic violence incident involving his girlfriend that spanned eight days.  Defendant argues that one of his convictions for false imprisonment should be reversed because the victim was continuously restrained, and the People agree.  Noting that the trial court imposed multiple upper terms during sentencing, defendant further asks us to remand for resentencing given the legislative changes brought about by Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill No. 567).  He also argues the trial court erroneously used

1

the same factors to impose upper terms and consecutive sentences.  Finally, defendant asks us to strike a $30 surcharge imposed under Penal Code section 1202.4, former subdivision (*l*).[1]

We will reverse one of defendant's convictions for false imprisonment, order the court to recalculate the related fees, and strike the $30 surcharge.  As modified, we will affirm the judgment.

## I.  BACKGROUND

*A.*　*Defendant's Relationship with the Victim*

Defendant and the victim began dating in May 2018.  She moved in with him in August 2018.  A few weeks later, defendant's pregnant sister and three children moved in with defendant and the victim.  The sister gave birth to twins in September 2018.  After the sister moved in, defendant angered more easily.

Defendant was "really particular" about the house and "[e]verything had to be in its place when he got home."  The victim was responsible for cleaning and tidying the home, and defendant got mad if there was any kind of mess.  For example, soon after defendant's sister moved in, the victim splattered grease while cooking, and defendant grew so enraged that he slapped her.  Defendant also got mad if anyone tracked in dirt or water from outside.

Defendant was violent with the victim other times.  In August 2018, right after she moved in, the two of them started arguing while they were coming home from dinner.  Defendant suddenly punched her between the eyes, and the victim felt everything go "black."  The victim tried to get out of the car, but defendant grabbed her and hit her again.  Defendant drove them home.  When they arrived home, the victim attempted to run.  Defendant grabbed the victim by her hair and pulled her into the house.  Concerned

---

[1] Undesignated statutory references are to the Penal Code.

2

she would have a black eye, defendant warned he would be in trouble if she went to the police and told her not to go to work. Embarrassed by her visible injuries, the victim quit her job. In October 2018, he slapped, kicked, and punched her as they were coming home from a movie. Another time, defendant threw a phone at her so hard that she suffered bruises.

After the physical incidents, defendant would apologize and say he would not hurt her again. He gave her money, furniture, and flowers. Occasionally he would cook. The victim hoped this meant he was working on his anger.

Defendant checked the victim's cell phone multiple times every day, looking at her messages and history. On two separate occasions, he broke two different phones of the victim's by snapping them in half, throwing one of them over the backyard fence. After, defendant bought her new phones.

## B. Incident Starting October 26 Through November 2, 2018

The victim started a new job on October 26, 2018, over defendant's objection. Defendant said he would "black" both of her eyes so she would not work. Defendant seemed angry when he dropped her off at work that morning, complaining he would now be late for his work. Defendant asked the victim to call him during her lunchtime and breaks.

After work, the victim returned home and made food for herself and defendant's sister. Defendant arrived home later that evening and became enraged when he found dirty dishes in the kitchen sink. Defendant slapped her in the face so hard that her ears rung and she saw flashes. The victim hit defendant back, and defendant then followed her to the bedroom. He hit and kicked her, and she passed out.

When she finally woke up, she found herself on the floor in pain and with blood "pouring out of" her nose and mouth. She could not see out of one of her eyes, and everything looked blurry out of her other eye because her contacts had been knocked out. Defendant grabbed her by her shirt, dragged her to the bathroom, and turned the shower

on her. The victim begged defendant's sister, who was standing nearby, to call the police, but defendant said not to. Instead, defendant asked his sister to go to the store to buy alcohol and pain medication for the victim, and the sister left. Defendant complained about the mess from the blood.

When she finished the shower, the victim got dressed and ran out of the house. Before she could get to the front gate, defendant grabbed her by the back of her hair, threw her to the ground, and kicked her repeatedly in the stomach. He kicked her so hard that she urinated. Defendant then dragged her by her hair back into the house. He said he was sorry and then went to the kitchen to make an ice pack. The victim tried to leave again, but defendant caught her by the hair. She fell, and defendant beat her again, this time more severely. Defendant then dragged her back into the house, put her in the bedroom, and closed the door. The victim feared defendant was going to kill her.

The victim tried to leave again, this time through the bedroom window. Defendant entered the bedroom and pulled her by the leg toward the bed, causing her to fall in the process. Defendant demanded she look at him and then hit her with her cell phone, striking her directly in her right eye and causing the victim "a tremendous amount of pain." The victim had previously told defendant she had significantly better vision in her right eye, and he said, " 'And that's your good eye too, isn't it?' " Defendant then warned her that she was " 'not going anywhere.' " The victim protested she was in pain, and defendant gave her a handful of over-the-counter painkillers and some liquor to wash them down. Defendant then sat in front of the bedroom door.

The victim tried to go to sleep, but defendant came in and laid down with her on the bed. He said her face looked like " 'hamburger meat.' " The victim fell asleep but woke up to defendant having intercourse with her. The victim was in severe pain and asked him to stop, but he continued. Her breathing became shallow.

The next day, defendant called in sick to work and stayed home. The victim was "in and out," and in a lot of pain. She still could not see out of her right eye, and it felt as

4

though it had swollen shut. Defendant repeatedly gave her pills with alcohol. The victim continued to fear for her life.

Defendant also stayed home the following day (Sunday, October 28). The victim was still in so much pain that she could hardly move, and she was unable to eat or urinate. She again asked to go to the doctor, but defendant said he would have to "think about it," because he was afraid of getting into trouble. Instead, he wrapped her head in a bandage, applied Neosporin, and gave her pain pills. At one point, she again woke up to defendant having intercourse with her. He again ignored her pleas to stop. After he was done, defendant asked if it had hurt, and the victim replied yes. Defendant gave her more pills.

The next day (Monday, October 29), defendant asked his sister to look after the victim, because he had to leave for work. Defendant offered to forgive some money she owed him. After defendant left, the sister came into the bedroom and promised to call the police if defendant hit the victim again. But, she could not let the victim leave because defendant "need[ed]" the victim there. Defendant returned later that day and forced the victim to take a shower, even though it hurt her. The victim felt defendant was waiting for her to die. She fell asleep and again awoke to defendant having intercourse with her. She again asked him to stop, saying she was in a lot of pain, but he ignored her. Defendant again gave her pills and beer.

The following day (Tuesday, October 30), defendant again asked his sister to look after the victim, so he could go to work. Before he left, he gave her more pills and beer. Later that day, the victim's friends came looking for her, but defendant's sister lied and said the victim was not there. That evening, defendant forced the victim to eat, even though her jaw was swollen and in pain. She fell asleep and again woke to defendant having intercourse with her, ignoring her request to stop because of the pain. Defendant instructed her to continue asking him to stop.

5

On October 31, defendant forced the victim to have a bath. As she was bathing, he told her that his mother had died in that bathtub.

On November 1, the victim was able to reach one of her friends and ask to be picked up the next day, after defendant had left for work and the sister had left to drop her kids off at school. That day, defendant stopped giving the victim pain pills because she questioned whether they were the same pills as before. Later that night, defendant again forced the victim to have sexual intercourse with him.

On November 2, defendant slapped the victim on the side of the head. The sister ignored the victim's requests to call the police. Later that morning, the victim's friend picked her up and took her to the hospital. The victim was treated for a right orbital fracture, broken nose, and a ruptured eardrum. The victim required surgery to remove her right eye, and she required a prosthetic eye. She also suffered a brain injury. At trial, a radiologist opined that the victim's injuries were due to blunt force trauma.

As a result of her injuries, the victim is unable to drive, cook, or work. She suffers from nightmares and only sleeps with the lights on. She also has trouble breathing.

At trial, evidence was introduced that defendant had committed multiple prior acts of domestic violence. One of defendant's ex-wives testified that he hit her in front of her then two-year-old daughter. Another ex-wife testified defendant had hit and kicked her.

Defendant testified that he argued with the victim due to her alcohol consumption. He denied ever raping or torturing the victim, and claimed the victim hit him first, so he punched her back two times in the face "to get her off of [him]." He invited her to leave and offered to take her to the hospital, but she refused because he would not stay with her. During his testimony, he also admitted to three domestic violence convictions: (1) a 2006 conviction for hitting his first ex-wife in the arm and mouth; (2) a misdemeanor domestic battery conviction for hitting his second ex-wife; and (3) a conviction for pulling a necklace off his second ex-wife's neck. He also admitted to: (1) a 2015 conviction for committing a lewd act on a child less than 10 years younger than him;

6

(2) a 2010 felony conviction for being a prohibited person in possession of a firearm; and (3) a conviction for disturbing the peace. He additionally admitted to being sent to a 52-week batterer treatment program after his 2006 conviction, and then a second 52-week batterer treatment program after a subsequent domestic violence conviction. He further admitted that he had knowingly violated a restraining order in favor of one of his ex-wives.

C.      *Charges Filed and Jury Verdict*

Defendant was charged with false imprisonment by violence (§ 236—count 1), two counts of corporal injury to a cohabitant (§ 273.5, subd. (a)—counts 2 & 3), four counts of rape by force or fear (§ 261, subd. (a)(2)—counts 4-7), aggravated mayhem (§ 205—count 8), torture (§ 206—count 9), kidnapping (§ 207, subd. (a)—count 10), and criminal threats (§ 422, subd. (a)—count 11). As to counts 2 and 3, it was further alleged defendant inflicted great bodily injury (§ 12022.7, subd. (e)). Enhancements pursuant to section 667.61 were alleged as to counts 4 through 7.

During closing argument, the prosecutor explained that count 2 "specifically cover[s] the conduct that's involved when [the victim testified that defendant] came at her with both fists and a foot, . . . striking her in the face, rendering her unconscious. And when she awoke, she was pouring blood, I believe she described it as a waterfall coming from her nose and her mouth." The prosecutor continued, "the two punches and the kick is the conduct that is covered in [c]ount 2." She further explained that the great bodily injury related to count 2 was the "gushing blood," broken nose, and loss of consciousness.

In March 2021, a jury found defendant guilty of counts 1 through 4 and 7. The jury convicted defendant of the lesser included offenses of simple mayhem (§ 203) in count 8 and false imprisonment (§ 236) in count 10. The jury found the great bodily injury allegations to be true, but the section 667.61 allegations to be not true. The jury

7

hung on the remaining counts, and, based on a motion by the prosecution, the court dismissed them.

D.    *Sentencing*

In July 2021, the trial court sentenced defendant to an aggregate term of 28 years in prison, as follows:  the upper term of four years for count 2 plus the upper term of five years for the great bodily injury enhancement (or nine years total); eight months (one-third the midterm) consecutive for count 1; one year (one-third the midterm) consecutive for count 3 plus 16 months (one-third the midterm) consecutive for the great bodily injury enhancement; and the upper term of eight years consecutive for each of counts 4 and 7 (or 16 years total).  The trial court imposed, but stayed pursuant to section 654, an eight-year upper term on count 8 and a two-year midterm on count 10.  The trial court imposed a $300 restitution fine (§ 1202.4) plus a 10 percent surcharge (§ 1202.4, former subd. (*l*)), a corresponding $300 parole revocation fine (suspended unless parole is revoked) (§ 1202.45), a $40 per count court operations fee (or $280 total) (§ 1465.8, subd. (a)(1)), and a $30 per count criminal conviction assessment fee (or $210 total) (Gov. Code, § 70373).

During the sentencing hearing, the court noted it had reviewed the probation report, which listed two felony and seven misdemeanor convictions:  (1) a 2006 conviction for misdemeanor fighting (§ 415); (2) a 2006 conviction for misdemeanor corporal injury to a spouse or cohabitant (§ 273.5, subd. (a)); (3) a 2006 conviction for misdemeanor battery (§ 243, subd. (e)); (4) a 2008 conviction for misdemeanor battery (§ 243, subd. (e)); (5) a 2008 conviction for misdemeanor battery (§ 243, subd. (e)); (6) a 2010 conviction for felony unlawful possession of a firearm (former § 12021, subd. (c)(1)); (7) a 2011 conviction for misdemeanor corporal injury to a spouse or cohabitant (§ 273.5, subd. (a)); (8) a 2015 conviction for felony lewd or lascivious acts (§ 288, subd. (c)(1)); and (9) a 2017 conviction for misdemeanor reckless driving (Veh. Code, § 23103, subd. (a)).  The report stated the source of its information regarding defendant's criminal

history was the California Bureau of Criminal Identification and Investigation. The report further stated that defendant was on probation at the time of his arrest for the current incident.

The court found no mitigating factors and multiple aggravating factors. Defendant had shown no remorse and had openly mocked and laughed at the victim, even as she was visibly upset and crying throughout her testimony and required many breaks. He also laughed about his prior relationships and instances of domestic violence, and he appeared to be manipulative. Moreover, defendant had several prior domestic violence and sexual offenses, yet he "continues with this behavior." Despite the services he had been offered, he continued to "reoffend[ ] even worse [than] his prior offense." He had shown himself to be a danger to society and "any female he may choose to have a relationship with."

In addition, the court noted: "The crime involved great violence, great bodily harm, threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness, [and] callousness. . . . [¶] He did cause great injury to the victim, caused her to lose her eye over multiple days that the offenses were committed. She asked, according to the evidence, to be taken to the doctor. He refused based on his own interest. The victim was particularly vulnerable. At the time of the rapes, she had her eyes bandaged, was in pain. [¶] Also, at the time of the incident with the phone hitting her in the eye . . . , she had already been abused and was bleeding." The court further found that defendant: (1) is engaging in violent conduct that indicates a serious danger to society; (2) has numerous prior convictions as an adult that are of increasing seriousness; (3) had multiple prior convictions for domestic violence; and (4) had a prior sexual conviction which required registration as a sexual offender pursuant to section 290. In addition, defendant had previously performed poorly on probation, and probation had determined that defendant had an above average risk to reoffend.

9

The prosecutor asked the court to clarify which aggravating circumstances it was relying on in selecting the upper terms for the substantive offenses and the great bodily injury enhancement, warning that the court could not use either the elements of the offense or the enhancements to select the upper term. The court replied, "I'll clarify it right now. On the underlying offenses, it's based on the defendant's history of increasing domestic violence, multiple domestic violence offenses [, and] with regard to the enhancement . . . [i]t is based on the viciousness of the great bodily injury suffered by the victim."

With respect to selecting consecutive sentencing, the court stated it "never expected to watch a trial that had the facts that this trial had in it with regard to how the abuse was carried out, the viciousness with which the abuse was carried out. [¶] The attempts to stop the victim from leaving, even through the window when she attempted to do that, holding the victim captive for, I believe it was eight days, putting Neosporin in her eye, and as I indicated previously, submerging her head in water, wrapping her head tight, giving her alcohol and pain pills and sleeping pills throughout that eight-day period. [¶] Now, I understand there was testimony that the victim drinks beer every day . . . , but in her state with her head bandaged, alcohol and pills was not a good combination, sleeping pills and pain pills and then not taking her for medical treatment immediately, and with the stated purpose, according to the evidence, that the defendant would be arrested if he took her for medical treatment. [¶] I think the factors and the facts in this case are egregious to the point that only consecutive sentence makes sense."

## II. DISCUSSION

### A. *False Imprisonment Conviction*

Defendant argues that one of his convictions for false imprisonment should be reversed because the victim was continuously restrained. The People agree, and so do we.

10

False imprisonment occurs when a person is " ' "compelled to remain where he [or she] does not wish to remain, or to go where he [or she] does not wish to go." ' " (*People v. Reed* (2000) 78 Cal.App.4th 274, 280.)  False imprisonment is a lesser included offense of kidnapping, and therefore should be similarly treated as being a continuing offense until such time as the defendant releases the victim.  (See *People v. Jandres* (2014) 226 Cal.App.4th 340, 362 [false imprisonment is a lesser included offense of kidnapping]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1159 [kidnaping is a continuing offense so long as the detention continues].)  Where there was a single abduction followed by a continuous period of detention, a defendant cannot be convicted of two counts of false imprisonment.  (See *People v. Thomas* (1994) 26 Cal.App.4th 1328, 1335 [reversing one of the defendant's two kidnapping convictions where the period of detention was continuous].)

Here, nothing severed the course of conduct that would give rise to separate detentions and support two false imprisonment convictions.  From the time of the first beating on October 26, defendant kept the victim continuously detained in the home until her final escape on November 2.  He thwarted each of her three earlier attempts to leave, beating her with increasing severity after each attempt.  He then enlisted his sister to watch the victim when he needed to leave the house for work.  The sister had previously ignored the victim's requests to call the police, and she turned the victim's friends away when they came to find her on October 30.  Because there is no indication the victim ever felt free to leave between October 26 and November 2, we will strike the conviction on count 10, false imprisonment.

Given our findings, we will order the court to revise the calculation of the court operations fee and criminal conviction assessment fee.

B.      *Senate Bill No. 567*

Defendant argues we must vacate his sentence and remand for a full resentencing hearing in light of the legislative changes brought about by Senate Bill No. 567.  The

11

People agree Senate Bill No. 567 applies retroactively but argue remand is unnecessary because any error was harmless.  We agree that the amendments to section 1170 apply retroactively to defendant's nonfinal judgment on appeal.  (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109 (*Zabelle*).)  However, we disagree that remand is necessary.

Effective January 1, 2022, when a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the trial court must impose a term not exceeding the middle term unless there are circumstances in aggravation that justify the imposition of a term exceeding the middle term and the facts underlying those aggravating circumstances: (1) have been stipulated to by the defendant; (2) have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial; or (3) relate to the defendant's prior convictions and are based on a certified record of conviction. (§ 1170, subd. (b)(1)-(3); Stats. 2021, ch. 731, § 1.3.)

Here, the trial court found no mitigating circumstances and multiple circumstances in aggravation to justify the imposition of the upper term on counts 2, 4, 7, and 8, and the great bodily injury enhancement associated with count 2, as follows:  Defendant's prior convictions as an adult were numerous and increasing in seriousness, defendant had shown no remorse, defendant had shown himself to be a danger to society, the crime involved great violence and a high degree of viciousness, the victim was particularly vulnerable, defendant had multiple prior convictions for domestic violence, defendant had a prior conviction that required him to register as a sex offender, and his prior performance on probation supervision was unsatisfactory.  None of these aggravating circumstances were determined by a jury, a court trial, or stipulated to by defendant.  The trial court did not make these findings as required by Senate Bill No. 567.  (§ 1170, subd. (b)(1), (2).)

The trial court did not have the benefit of the amendments to section 1170 when it sentenced defendant.  But, "before finding remand appropriate, [we] must first subject the trial court's error to harmless error review."  (*Zabelle, supra*, 80 Cal.App.5th at p. 1110.)

12

This requires a two-step analysis for determining harmless error: (1) whether the court could impose the aggravated term under the Sixth Amendment; and (2) whether the court would impose the aggravated term under section 1170. (*Zabelle, supra*, at pp. 1111-1112.) We review the first question for prejudice under the standard described in *Chapman v. California* (1967) 386 U.S. 18, and the second question under the standard in *People v. Watson* (1956) 46 Cal.2d 818. (*Zabelle, supra*, at p. 1112.) Under the *Chapman* analysis, " '[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless.' " (*Id.* at p. 1111.)

Here, it is unquestionable that the jury would have found true beyond a reasonable doubt that defendant had prior convictions as an adult that were either numerous or of increasing seriousness. (See Cal. Rules of Court, rule 4.421(b)(2).)[2] During his testimony, defendant admitted to six criminal convictions since 2006: (1) his three domestic violence related convictions involving his two ex-wives; (2) his 2015 conviction for committing a lewd act on a child less than 10 years younger than him; (3) a 2010 felony conviction for being a prohibited person in possession of a firearm; and (4) a conviction for disturbing the peace. Although the jury did not hear the exact details of each conviction he admitted to, defendant's general description of his convictions matched the information in the probation report, which was gathered from the California Bureau of Criminal Identification and Investigation.[3] Based on defendant's testimony and the probation report, it would have been clear to the jury that defendant's troubles with the law had grown increasingly worse. Defendant told the jury that his troubles with

---

[2] Undesignated rule references are to the California Rules of Court.

[3] Defendant did not testify regarding the 2017 misdemeanor conviction because the trial court ruled that it was improper impeachment testimony.

13

the law started with his conviction for disturbing the peace related to an interaction with his ex-wife, which occurred just prior to his 2006 conviction for hitting the same ex-wife. He then admitted to two subsequent convictions for domestic violence, plus a sex offense conviction in 2015. He also admitted to having attending two 52-week batterer's programs and to violating a protective order in favor of one of his ex-wives. These convictions were undoubtedly numerous, and went from misdemeanors to felonies, clearly indicating increasing seriousness.

In addition, given defendant's undisputed testimony regarding his criminal history, which in relevant part matched the probation report, it is unquestionable that the jury would have found beyond a reasonable doubt it to be true that defendant had multiple prior convictions for domestic violence, as well as a prior conviction that required him to register as a sex offender. (Rule 4.421(c) [permitting the consideration of "[a]ny other factors . . . which reasonably relate to the defendant or the circumstances under which the crime was committed].) Under the circumstances, we find that the denial of defendant's right to a jury trial on the aggravating circumstances was harmless in terms of the Sixth Amendment.

It is less clear to us that the jury would have found true beyond a reasonable doubt the remaining aggravating factors noted by the judge, namely whether: (1) defendant had exhibited remorse or shown himself to be a danger to society; (2) the crime involved great violence and a high degree of viciousness; (3) the victim was particularly vulnerable; or (4) his prior performance on probation supervision was unsatisfactory. "[T]o the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*People v. Sandoval* (2007) 41 Cal.4th 825, 840.)

14

We next turn to the second step of the *Zabelle* analysis, whether or not the court would have imposed the aggravated term under section 1170, applying the harmless error standard in *People v. Watson, supra*, 46 Cal.2d 818. (*Zabelle, supra*, 80 Cal.App.5th at p. 1112.) As applied to defendant's case, we must "first, for each aggravating fact, consider whether it is reasonably probable that the jury would have found the fact not true. We must then, with the aggravating facts that survive this review, consider whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts." (*Ibid*.)

For the same reasons we discussed above under the *Chapman* review, we conclude it is reasonably probable under the *Watson* standard that the jury would find true the aggravating circumstances of numerosity or increasing seriousness, the multiple prior convictions for domestic violence, as well as the prior conviction that required him to register as a sex offender.

We also conclude it is reasonably probable that a jury would find true the aggravating circumstance that the great bodily injury associated with count 2 involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness. (Rule 4.421(a)(1).) Although the jury hung on the torture charge and found defendant guilty of the lesser included offense of simple mayhem (§ 203) rather than aggravated mayhem, there was overwhelming evidence that defendant inflicted great violence when he punched and kicked her in the face so hard that she lost consciousness. She awoke to blood "pouring out of" her nose and mouth, and she had difficulty seeing after the attack. Under the circumstances, it is reasonably probable that a jury would have found that the great bodily injury involved great violence and bodily harm, or that defendant acted with cruelty, viciousness, or callousness.

Given that these were the exact two aggravating circumstances highlighted by the court as to why it was selecting the upper terms on the underlying convictions and the

15

great bodily injury enhancement, we conclude it is not reasonably probable that the court would have chosen a lesser sentence based only on these facts. As such, the error was harmless and remand is not required.

## C. Sentencing

For the first time on appeal, defendant challenges his sentence on grounds that the trial court violated the prohibition against the dual use of sentencing factors. According to defendant, remand is required because the court relied on the same fact to impose an upper term sentence on counts 2, 4, and 7 and consecutive sentences. Defendant further contends the trial court erroneously relied on the elements of false imprisonment when it imposed a consecutive sentence on count 1 (false imprisonment). (See *People v. Scott* (1994) 9 Cal.4th 331, 350, fn. 12 (*Scott*) ["it is clear that the court cannot rely on the same fact to impose both the upper term and a consecutive sentence"]; rule 4.425(b) ["Any circumstances in aggravation or mitigation . . . may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: [¶] (1) A fact used to impose the upper term; [¶] . . . [¶] [and] (3) A fact that is an element of the crime"].)

We agree with the People that defendant has forfeited the issue on appeal because he failed to object in the proceedings below. "[C]omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal," including arguments that the court "double-counted a particular sentencing factor" in the sentence. (*Scott, supra*, 9 Cal.4th at pp. 356, 353.)

## D. Fines and Fees

At the time of sentencing, the trial court was authorized to impose a 10 percent surcharge on the $300 restitution fine (or $30 total). (§ 1202.4, former subd. (*l*).) However, effective January 1, 2022, the Legislature eliminated that surcharge and directed that any unpaid portion of the previously imposed surcharge must be vacated.

16

(§§ 1202.4, 1465.9, subd. (b); see Stats. 2021, ch. 257, § 35.)  The parties agree defendant is entitled to relief, and we will so order.

## III.  DISPOSITION

Defendant's conviction on count 10 is reversed.  The court is directed to recalculate the court operations fee and criminal conviction assessment fee, based on the revised number of counts.  Any unpaid portion of the $30 surcharge imposed pursuant to section 1202.4, former subdivision (*l*) is vacated.  The judgment is otherwise affirmed.  The court is further directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.


/S/

RENNER, Acting P. J.



We concur:


/S/

BOULWARE EURIE, J.


/S/

HORST, J.*


* Judge of the Placer County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17